## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AKRAM SAFADI,                           )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )   Case Number:  1:07CV1817 (RMC)
                                        )
PAUL NOVAK, Director,                   )
Vermont Service Center,                 )
United States Citizenship & Immigration )
Services, et al.,                       )
                                        )
            Defendants.                 )
_____ )

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

The United States District Court for the Eastern District of Virginia held that it lacked

jurisdiction to review Plaintiff's prior challenge to the pace at which Defendants adjudicated his

adjustment of status application, and that ruling precludes Plaintiff from pursuing this suit.  See

Safadi v. Howard, 466 F. Supp. 2d 696 (E.D.V.A. 2006).  The Court reasoned that 8 U.S.C.

§ 1255(a) "vests USCIS with discretion over the *entire* process of adjustment application

adjudication," and therefore 8 U.S.C. § 1252(a)(2)(B)(ii) "precludes judicial review of any

'action,' meaning any act or series of acts, included within the ongoing adjudication and the pace

at which that action proceeds."  Safadi, 466 F. Supp. 2d at 700 (emphasis in original).  That

ruling disposed of the jurisdictional issue in the case, as section 1252(a)(2)(B)(ii) applies

"notwithstanding any other provision of law."  Id.  The Court further held that Plaintiff could not

obtain a writ of mandamus because Defendants did not owe him "a clear nondiscretionary duty

to process his adjustment of status application at any particular pace or speed."  Id. at 700.

Finally, the Court held that the Administrative Procedure Act did not "restore" subject matter jurisdiction, because the action being challenged is "committed to agency discretion by law." Id.

Plaintiff concedes, as he must, that the Safadi opinion addressed the same jurisdictional issues on which he must prevail in order to pursue this suit. See Opp. to Motion to Dismiss at 1 (Dkt. Entry 12) ("Opp."). However, Plaintiff attempts to sidestep the impact of that ruling by arguing that this case falls within the "curable defect" exception to the doctrine of collateral estoppel. Plaintiff's reliance on that exception is misplaced.

The "curable defect" exception to issue preclusion applies when a change in facts occurs after the dismissal which cures the jurisdictional defect on which the prior dismissal was founded. See GAF Corp., 818 F.2d at 264 & n. 74; Newdow v. Bush, 355 F. Supp. 2d 265, 275 (D.D.C. 2005). There has been no such change here. The Safadi Court's jurisdictional analysis turned on its conclusion that Congress has given USCIS "discretion over the entire process of adjustment application adjudication," including any series of acts within the adjudication process and the pace at which the adjudication proceeds. Safadi, 466 F. Supp. 2d at 700. That holding was not dependent upon the facts of this case, but instead was a question of law concerning the interpretation of Sections 1255 and 1252(a)(2)(B) of the INA. Congress has not amended the INA to deprive USCIS of discretion over the adjudicatory process. Thus, Plaintiff is bound by that ruling, and collateral estoppel precludes him from relitigating those legal issues in this Court.[1]

---

[1]  Plaintiff's assertion that other district courts have rejected Safadi and concluded that they have jurisdiction is of no moment. See Newdow, 391 F. Supp. 2d at 101 n. 4 ("The application of issue preclusion does not turn on the correctness of the earlier decision."). It is true that district courts are split on this issue, although the majority of District Judges that have reviewed the issue in this District have concurred with Safadi. See Orlov v. Howard, 523 F.Supp.2d 30, 36 (D.D.C. 2007) (concluding that the pace of processing applications falls within the discretion of USCIS and is unreviewable); Luo v. Keisler, 521 F. Supp. 2d 72 (D.D.C. 2007) (same).

Further, even if the <u>Safadi</u> ruling were dependent upon the facts of this case — and it was not — the "curable defect" exception would not permit Plaintiff to relitigate <u>Safadi</u> by arguing that this is a case in which USCIS has "refused altogether to process an adjustment application or where the delay was so unreasonable as to be tantamount to a refusal to process the application." <u>Safadi</u>, 466 F. Supp. 2d at 700. The <u>Safadi</u> Court already held that "[t]his case presents no such facts." <u>Id.</u> In so ruling, the Court rejected Plaintiff's argument that USCIS was not adjudicating the application, and would let it languish indefinitely absent judicial intervention. <u>See</u> Exh. 1 at 2-3 (Defendants' Reply in Support of Motion to Dismiss) (addressing Plaintiff's arguments). The Court credited the "evidence that USCIS is actively processing plaintiff's application," which included an affidavit from the Acting Service Center Director for the USCIS Vermont Service Center. <u>Safadi</u>, 466 F. Supp. 2d at 701; <u>see</u> Exh. 3 (Reader Declaration). USCIS has demonstrated that it is still actively processing the application. <u>See</u> Declaration of Keith Canney, ¶¶ 11-12 (Exh. 1 to Dkt. Entry 10) ("First Canney Decl."); Declaration of Keith Canney, ¶¶ 2 (Exh. 2) ("Second Canney Decl.").

Plaintiff now argues that the <u>Safadi</u> Court should not have believed the evidence USCIS submitted concerning its active adjudication of Plaintiff's I-485 because USCIS misplaced documents pertaining to the I-140 petition filed on Plaintiff's behalf by his employer, and speculates that District Judge Ellis would have reached a different conclusion had he been aware of the misplaced I-140. <u>See</u> Opp. at 3-6. But to the extent that Plaintiff is arguing that the prior declaration was inaccurate, that simply challenges the facts as they existed at the time the <u>Safadi</u> Court dismissed the prior action. This Court has never held that the "curable defect" exception

---

Although other plaintiffs may rely on contrary cases when opposing a motion to dismiss, collateral estoppel precludes Plaintiff from doing so.

can be used in that manner; instead, it applies to facts that postdate the dismissal.[2]  See Citizen Electronics Co., Ltd v. Osram GMBH, 2005 WL 3484202, at * 3 (D.D.C. Dec. 20, 2005) (rejecting plaintiff's argument that the 'curable defect' doctrine could be used to address "newly discovered" jurisdictional facts that existed at the time of the dismissal); accord Park Lake Resources Ltd. Liability v. U.S. Dep't of Agriculture, 378 F.3d 1132, 1137 (10th Cir. 2004) ("the change in circumstances that cures the defect must occur subsequent to the prior litigation"). Moreover, the USCIS declaration submitted in the prior action did not — as Plaintiff contends — state that the security issues were the "only" cause for the delay.  See Reader Decl. ¶ 11 (Exh. 3). Thus there is no conflict between that declaration and the subsequent communications in which USCIS requested another copy of the materials submitted with the I-140.

To the extent that Plaintiff contends that this case has now become one in which USCIS has refused to process the adjustment application, that argument fares no better.  The Safadi Court already held that the mere passage of time does not support an inference that USCIS has refused to process an application.  See Safadi, 466 F. Supp. 2d at 701.  Keith Canney, the Functional Manager for the Vermont Service Center, has testified under penalty of perjury that "there are security issues relating to [Plaintiff's] eligibility for a green card that USCIS continues to assess."  Second Canney Decl., ¶ 8; see also First Canney Decl., ¶¶ 11-12.  Further, since the Eastern District of Virginia dismissed the first Safadi case, USCIS has received additional results of the FBI name check, the IBIS security check, and fingerprinting security checks; those security check results require further review.  See First Canney Decl., ¶¶ 8-10.  USCIS also has

---

[2]  To the extent a party believes that it has previously undiscovered evidence which would affect the outcome of a court's prior ruling, the issue should be addressed in a Rule 60(b) motion presented to the Court that decided the issue in the first instance, rather than being raised as a basis for a different Court to strip the prior ruling of preclusive effect.  See Fed. R. Civ. P. 60(b).

requested additional information concerning Plaintiff's I-140.[3]  See id. ¶ 12.  As Mr. Canney explained, the fact that the I-140 was misplaced at some point during the adjudication process does not change the fact that there are security issues that USCIS is actively reviewing in its adjudication of Plaintiff's I-485 application for adjustment of status.  See Second Canney Decl. ¶ 8.  Mr. Canney's testimony is entitled to "a presumption of good faith."  Calton v. Babbitt, 147 F. Supp. 2d 4, 8 (D.D.C. 2001).  That testimony clearly establishes that "this is a case in which USCIS is and has been processing plaintiff's adjustment of status application, but has done so at a pace plaintiff finds unsatisfactory."  Safadi, 466 F. Supp. 2d at 701.

In sum, issue preclusion bars Plaintiff from establishing that this Court has jurisdiction to review his challenge to the pace at which USCIS is adjudicating his application for adjustment of status.  USCIS has discretion over the entire adjudication process, including its ongoing review of the security issues revealed through the security checks.  That discretion forecloses judicial review.  Although Plaintiff obviously disagrees with the Safadi Court's analysis and holdings, he cannot escape their preclusive effect simply by filing another complaint in this Court less than one year after losing in the Eastern District of Virginia.

---

[3]  Plaintiff's suggestion that there was a "lack of candor" by USCIS regarding the notice of action requesting additional documentation is unfounded.  Opp. at 5.  USCIS had not received Plaintiff's response as of the date the First Canney Declaration was signed and Defendant's Motion to Dismiss was filed.  USCIS received those documents January 18, and January 23, 2008.  See Second Canney Decl., ¶ 6.

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Defendants' Motion to Dismiss, this case should be DISMISSED for lack of jurisdiction.

Dated: February 22, 2008                     Respectfully submitted,

                                            /s/
                                  JEFFREY A. TAYLOR, D.C. BAR # 498610
                                  United States Attorney

                                            /s/
                                    RUDOLPH CONTRERAS, D.C. BAR #434122
                                  Assistant United States Attorney

                                      /s/ Robin M. Meriweather
                                  ROBIN M. MERIWEATHER, D.C. Bar # 490114
                                  Assistant United States Attorney
                                  555 Fourth St., N.W.
                                  Washington, D.C.  20530
                                  Phone: (202) 514-7198 Fax: (202) 514-8780
                                  Robin.Meriweather2@usdoj.gov

OF COUNSEL:

Bridgette H. Parascando
Associate Counsel
USCIS Vermont Service Center

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| AKRAM SAFADI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-1055 (TSE/TRJ) |
| | ) | |
| PHYLLIS HOWARD, District Director, | ) | |
| Washington Field Office, U.S. Citizenship | ) | |
| and Immigration Services, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Defendant Phyllis Howard, the District Director of the Washington Field Office of the

United States Citizenship and Immigration Services ("USCIS" or "the Agency"), through

counsel, respectfully submits this memorandum in response to Plaintiff's Opposition to

Defendant's Motion to Dismiss ("Pl. Opp."). Because Plaintiff fails to demonstrate that the

Court has jurisdiction over this action, or that judicial review may be had under the

Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, the complaint should be

dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6).

I.      **Plaintiff's Assertions Regarding His Security and Background Checks Are
        Unsupported By the Record.**

Plaintiff asserts that "all appropriate checks have been conducted and completed" and that

he has "survived the scrutiny of 'more than twenty federal law enforcement and intelligence

agencies.'" (Pl. Opp. at 19). The declaration of Todd W. Reader ("Reader Declaration") simply

does not support these assertions. See Defendant's Exhibit 1 ("DEX 1"), attached to

1

Memorandum in Support of Defendant's Motion to Dismiss.

The Reader Declaration lays out the dates when USCIS received results for each of the checks it initiated, but, notably, it does not describe them as "completed."[1] (Pl. Opp. at 19); DEX 1, ¶¶ 8-10. This is because the fact that results have been received does not mean that checks are "completed" in the sense that all work in evaluating the information they may yield has been finished. To the contrary, the declaration explains that "[f]ollowing these security checks, there are issues requiring further inquiry" and that "USCIS is continuing to review information and to evaluate the eligibility of the applicant for lawful permanent residence status." DEX 1, ¶ 11. In light of this ongoing inquiry, Plaintiff's conclusion that he has "survived the scrutiny of 'more than twenty federal law enforcement and intelligence agencies'" is incorrect. (Pl. Opp. at 19).

Plaintiff also complains that "Mr. Reader offers no estimation of the likely timeframe for completion of such 'further inquiry,' and that Plaintiff is left entirely in the dark regarding what possible subjects of further inquiry the Defendant is continuing to pursue." (Pl. Opp. at 18). Yet he cites nothing in the Immigration and Nationality Act ("INA") or any regulations requiring the Agency to provide him a "likely timeframe" for its discretionary adjudication of his I-485 application. Similarly, Defendant is unaware of any authority that mandates the disclosure of the Agency's investigative focus and activities, particularly given the types of sensitive and personal

---

[1] The Reader Declaration does not identify the dates when IBIS checks were initiated, but only the dates when responses were received. DEX 1, ¶ 10 ("IBIS checks were initiated[,] and responses were received on or around June 2006 and September 2006."). Plaintiff is incorrect that "IBIS checks were not even initiated until approximately three and a half years after he filed his adjustment application." (Pl. Opp. at n.4). IBIS checks are typically initiated at or around the time an application is filed.

information that background and security checks, by their very nature, are designed to ascertain.[2]
See DEX 1, ¶ 3.

Furthermore, there is no evidence that USCIS is allowing Plaintiff's I-485 application to
languish. (Pl. Opp. at 18). To the contrary, the Reader Declaration indicates that the results of
IBIS checks were only received as recently as September 2006, and that "[f]ollowing these
checks, there are issues that require further inquiry." DEX 1, ¶ 11. Under these circumstances,
even if the Court had jurisdiction to intervene in the adjudicative process—which we respectfully
submit that the Court does not have—judicial intervention is not justified by Plaintiff's imagined
need to prevent the Agency from "indefinitely" failing to adjudicate his application. (Pl. Opp. at
19). "USCIS is continuing to review and information and to evaluate the eligibility of the
applicant for lawful permanent resident status." DEX 1, ¶ 11. Such inquiry is well within the
Agency's discretion to undertake as it exercises its discretionary authority over adjustment of
status applications.

**II.      8 U.S.C. § 1252(a)(2)(B)(ii) Divests the Court of Jurisdiction Over Plaintiff's Claims.**

Although 8 U.S.C. § 1255(a) vests the Attorney General with broad discretion over the

---

[2] "Since September 11, 2001, [the Department of Homeland Security (DHS)] and its
predecessor agencies have expanded the scope of identity, law enforcement, and security
investigations and examinations before granting of immigration status to aliens." 70 Fed. Reg.
4743, 4743 (Jan. 31, 2005). The INA and its implementing regulations clearly contemplate such
investigative activities. See, e.g., 8 U.S.C. § 1005(a) (authorizing "direct and continuous liaison
with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and
with other internal security officers of the Government for the purpose of obtaining and
exchanging information for use in enforcing the provisions of this chapter in the interest of the
internal and border security of the United States"); 8 C.F.R. § 103.2(b)(7) ("The Service may
require the taking of testimony, and may direct any necessary investigation."); cf. 8 C.F.R. §
1003.47(a) (establishing procedures that "ensure that DHS has completed the appropriate
identity, law enforcement, or security investigations or examinations before the adjudication of
the application").

adjudication of adjustment of status applications, Plaintiff takes the position that 8 U.S.C. § 1252(a)(2)(B)(ii) only deprives the Court of jurisdiction to review USCIS's "ultimate decision" whether to grant or deny an application for adjustment of status, and not the intermediate decisions and actions that underlie the adjudicative process.[3]  (Pl. Opp. at 2).  Neither the canons of statutory interpretation nor the case law cited by Plaintiff justifies his restrictive construction of 8 U.S.C. § 1252(a)(2)(B)(ii).  Rather, § 1252(a)(2)(B)(ii) divests the Court of jurisdiction to intervene in the Agency's intermediate decisions over when to adjudicate an application and how to carry out its investigative duties.

A.    **The Discretion to Grant Permanent Residence Status Under 8 U.S.C § 1255(a) Necessarily Encompasses Discretion Over the Adjudicative Process.**

Plaintiff's contention that "[a]lthough the ultimate decision is within the agency's discretion, the adjudication process itself . . . is not" is untenable.  (Pl. Opp. at 8).  8 U.S.C. § 1255(a) provides that an applicant's adjustment of status application "*may* be adjusted by the Attorney General, *in his discretion*, and under such regulations as he *may prescribe*" (emphasis added).  In allowing the Attorney General to prescribe regulations, and in declining to specify what steps should be taken to determine eligibility, Congress ceded to the Attorney General discretion not only to decide whether to grant or deny an application, but also to decide when and how to make that determination.  Indeed, USCIS could not exercise its discretion to grant or deny an I-485 application if it lacked the basic discretion to determine what steps are necessary to

---

[3] Defendant has continued to refer to the "Attorney General" as having discretionary authority under 8 U.S.C. § 1255(a) because the text of § 1255(a) still refers to the Attorney General.  Although the text of § 1255(a) has not changed, with the establishment of the Department of Homeland Security, the Attorney's discretionary authority over adjustment of status has been transferred to the Secretary of Homeland Security and his delegate in USCIS.  See 6 U.S.C. § 271(b)(5); 6 U.S.C. § 557.

evaluate an application, and when it has enough information to make a final decision.  See, e.g., Zheng v. Reno, 166 F. Supp. 2d 875, 880 (S.D.N.Y. 1995) (referring to "the adjustment process" as "wholly discretionary").

The Reader Declaration itself is evidence of the Agency's discretion over the intermediate steps in adjudicating an I-485 application.  As the declaration confirms, USCIS has exercised its discretion to require the completion of background and security checks before an application may be adjudicated.[4]  DEX 1, ¶ 3.  In Plaintiff's case, the results of certain checks have necessitated "further inquiry" by the Agency—an inquiry that it is well within USCIS's discretion to undertake.  DEX 1, ¶ 11.  The record thus underscores that USCIS's discretion is not limited to the final decision of whether to grant or deny the application.  Because 8 U.S.C. § 1255(a) necessarily encompasses intermediate decisions and actions in the adjudicative process, § 1252(a)(2)(B)(ii) plainly precludes the Court from exercising jurisdiction over Plaintiff's claims.

**B.    Cardinal Rules of Statutory Interpretation Support the Agency's Position.**

Plaintiff argues that certain principles of statutory construction argue in favor of narrowly construing § 1252(a)(2)(B)(ii) to mean that courts only lack jurisdiction to consider a decision to deny an adjustment of status application "on the merits."  (Pl. Opp. 10).  Yet the principles upon which he relies do not compel this unjustifiedly narrow interpretation.  Rather, two cardinal rules of statutory construction overlooked by Plaintiff demonstrate that the Court lacks jurisdiction to review more than merely the final step in the adjudicative process.

Plaintiff draws on three principles of statutory construction cited in Obioha v. Gonzales, 431 F.3d 400, 405 (4th Cir. 2005).  The first canon, that "there must be a showing of 'clear and

---

[4] As noted above, supra n.2, the INA and regulations clearly contemplate such checks. See, e.g., 8 U.S.C. § 1005(a); 8 C.F.R. § 103.2(b)(7); cf. 8 C.F.R. § 1003.47(a).

convincing evidence' of a contrary legislative intent to restrict access to judicial view," id.

(quoting Board of Governors of Federal Reserve System v. MCorp Financial, Inc.

502 U.S. 32 (1991)), is satisfied here because the text of a statute may itself provide "clear and

convincing evidence" of Congress's intent to deprive the Court of jurisdiction. See, e.g., Board

of Governors, 502 U.S. at 44 ("[I]n this case the statute provides us with clear and convincing

evidence that Congress intended to deny the District Court jurisdiction to review and enjoin the

Board's ongoing administrative proceedings."). As explained in Defendant's opening

memorandum and elaborated below, the text of § 1252(a)(2)(B)(ii) plainly divests the Court of

jurisdiction over the discretionary adjustment of status process. See 8 U.S.C. § 1252(a)(2)(B)(ii)

("Notwithstanding any other provision of law . . . no court shall have jurisdiction to review . . .

(ii) any other decision or action" that is specified to be in the discretion of the Attorney General).

The second principle—that there is a "strong presumption in favor of judicial review of

administrative action," INS v. St. Cyr, 533 U.S. 289, 298 (2001)—is simply a presumption that,

"like all presumptions used in interpreting statutes, may be overcome by specific language or

specific legislative history that is a reliable indicator of congressional intent," Block v.

Community Nutrition Institute, 467 U.S. 340, 349 (1984). The presumption is overcome here by

the very specific, jurisdiction-depriving language of § 1252(a)(2)(B)(ii). Finally, the third rule of

statutory construction cited by Plaintiff—that "courts construe ambiguities in deportation statutes

in favor of the alien," Obioha, 431 F.3d at 405—lacks relevance in this case, because unlike the

plaintiff in Obioha, Dr. Safadi is not in removal proceedings.

　　　　Other canons of construction *not* cited by Plaintiff further support Defendant's argument.

Plaintiff first overlooks the critically important "plain meaning" rule. See Escobar v. U.S.

Immigration & Naturalization Serv., 935 F.2d 650, 652-53 (4th Cir. 1991) (Ellis, J.) ("The first

step in the interpretive effort is to ascertain whether the language in issue has a plain and ordinary meaning, for there is a strong presumption 'that the legislative purpose is expressed by the ordinary meaning of the [statutory] words used.'") (quoting <u>American Tobacco Co. v. Patterson</u>, 456 U.S. 63, 68 (1982)). As the Supreme Court has frequently reiterated, "[i]n a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 475 (1992) (citing <u>Demarest v. Manspeaker</u>, 498 U.S. 184, 190 (1991)). Here, the plain meaning of § 1252(a)(2)(B)(ii) deprives the Court of jurisdiction over Plaintiff's claims. As explained more fully in Defendant's opening memorandum, the Agency has made an intermediate "decision" that it must continue evaluating Plaintiff's application because the results of certain checks require further inquiry. (DEX 1, ¶ 11; (Def. Mem. at 7-8). Moreover, the Agency is continuing to take "action" to resolve the outstanding issues. <u>Id.</u> Because the authority for these decisions and actions is specified under 8 U.S.C. § 1255(a) to be within the discretion of the Attorney General, § 1252(a)(2)(B)(ii)—by its plain meaning—divests the Court of jurisdiction over Plaintiff's claims. <u>See</u> <u>Rodas v. Chertoff</u>, 399 F. Supp. 2d 697, 705 (E.D. Va. 2005) (Ellis, J.) (observing that the "plain language" of 8 U.S.C. § 1252(a)(2)(B)(ii) speaks with "pellucid clarity").

Second, it is also well-settled that "'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" <u>Jama v. Immigration and Customs Enforcement</u>, 543 U.S. 335, 357 (2005) (quoting <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 711, n. 9 (2004)); <u>see also Russello v. United States</u>, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two

7

subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship." ); Fiorani v. CACI, 192 B.R. 401, 405 (E.D. Va. 1996) (Ellis, J.) (citing Russello v. U.S. and applying this rule of statutory construction). Although Plaintiff acknowledges that the Fourth Circuit in Obioha, was interpreting § 1252(a)(2)(B)(i), he argues that this Court should "follow Obioha's sound guidance and likewise interpret 8 U.S.C. § 1252(a)(2)(B)(ii) 'to preclude review only where the basis for the discretionary decision addresses the merits of an enumerated provision.'" (Pl. Opp. at 10, quoting Obioha, 431 F.3d at 406).

In arguing that subsection (ii) should be interpreted to mean the same as subsection (i), Plaintiff would have the Court hold that two subsections that employ critically different language mean the same thing. Whereas subsection (i) narrowly deprives courts of jurisdiction over "any judgment regarding the granting of relief under" specified provisions, 8 U.S.C. § 1252(a)(2)(B)(i), subsection (ii) broadly divests courts of jurisdiction over "any other decision or action" the authority for which is specified in the subchapter to lie in the Attorney General's discretion, id. § 1252(a)(2)(B)(ii). In Obioha, the Fourth Circuit relied on both the word "under" and the phrase "regarding the granting of relief" to conclude that § 1252(a)(2)(B)(i) deprived the court of jurisdiction only over a decision on the merits of an enumerated provision. Obioha, 431 F.3d at 406 ("[A] natural reading of 'regarding the granting of relief' is consistent with the interpretation that it refers to a decision to grant relief on the merits of the provisions that follow."). These words are absent from § 1252(a)(2)(B)(ii), and the more expansive phrase "*any other* decision or action" is used instead. 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).

Under the well-settled rule that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were

8

intended," Jama, 543 U.S. at 357, subsections (i) and (ii) must have different meanings. Given

that subsection (i) has been read to be limited to decisions "on the merits," Obioha, 431 F.3d at

406, subsection (ii) must encompass a broader range of decisions or actions. Such decisions or

actions include USCIS's decision that additional inquiry is needed before it can adjudicate

Plaintiff's I-485 application—a decision that is well within its discretionary powers under 8

U.S.C. § 1255(a).    As noted in Defendant's opening memorandum, the withdrawal of subject

matter jurisdiction in this regard is consistent with the well-established proposition that judicial

review in immigration matters is narrowly circumscribed, see Reno v. Flores, 507 U.S. 292

(1993), and that control over immigration is largely entrusted to the political branches of the

government, see United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982).

### C.    Jean, Sepulveda, and Pinho Are Inapposite.

Plaintiff also contends that the Fourth Circuit and other Courts of Appeals have rejected

the Agency's construction of 8 U.S.C. § 1252(a)(2)(B)(ii), but none of the cases cited by Plaintiff

speak to the issue before this Court, much less reject the Agency's position. Rather, Jean v.

Gonzales, 435 F.3d 475 (4th Cir. 2006), Sepulveda v. Gonzales, 407 F.3d 59 (2d Cir. 2005), and

Pinho v. Gonzales, 432 F.3d 193, 203 (3d Cir. 2005), all address a different question: whether 8

U.S.C. § 1252(a)(2)(B) deprives courts of jurisdiction to consider a determination by the Board

of Immigration Appeals ("BIA") that an alien is statutorily ineligible to receive discretionary

relief.[5]  In each of these cases, the Courts of Appeals concluded that they retained jurisdiction

because the threshold determination of whether someone was statutorily *ineligible* for relief was

---

[5] As explained in Rodriguez v. Gonzales, 451 F.3d 60, 62 (2d Cir. 2006), "[o]btaining
adjustment of status or cancellation of removal is a two-step process," where the alien first must
show statutory eligibility, and then, assuming the alien is eligible, the Attorney General in his
discretion decides whether to grant relief.

9

a *legal* question distinct from the exercise of discretion.  See, e.g., Jean, 435 F.3d at 482 (holding that the BIA's threshold decision that Jean was ineligible to seek cancellation of removal was reviewable because "[t]he decision that an alien falls within one or more of the ineligible per se categories is not a discretionary decision.  It is essentially a legal determination involving the application of law to factual findings."); Sepulveda, 407 F.3d at 62 ("we hold that 8 U.S.C. § 1252(a)(2)(B) does not strip courts of jurisdiction to review nondiscretionary decisions regarding an alien's eligibility for the relief specified in 8 U.S.C. § 1252(a)(2)(B)(i)"); Pinho, 432 F.3d at 204 ("Determination of *eligibility* for adjustment of status—unlike the *granting* of adjustment itself—is a purely legal question and does not implicate agency discretion.") (emphasis original).

The holding of these cases—that courts retain jurisdiction to review the denial of an immigration benefit based on a finding of statutory ineligibility—is inapplicable here.  Most basically, there has not been a denial of adjustment of status—on either eligibility or discretionary grounds—because USCIS has not yet been able to determine whether to grant or deny the I-485 application.  See DEX 1, ¶ 11 (explaining that "further inquiry" is required).  Furthermore, while a court is well-equipped to consider whether the BIA properly applied non-discretionary, statutory criteria in determining eligibility, there are no comparable legal criteria for this Court to consider in deciding whether USCIS has properly determined that further inquiry must occur or improperly delayed the adjudication of an I-485 application.  That such criteria are lacking underscores that the decision as to when it is appropriate to adjudicate an I-485 application lies in the discretion of the Attorney General and is shielded from judicial review under § 1252(a)(2)(B)(ii).

**D.    The Ninth Circuit's Approach in <u>Spencer Enterprises</u> Does Not Support Plaintiff's Narrow Interpretation, and Should, In any Event, Be Rejected.**

Finally, citing Spencer Enterprises, Inc. v. United States, 345 F.3d 683 (9th Cir. 2003), and other Ninth Circuit decisions following it,[6] Plaintiff argues that 8 U.S.C. § 1252(a)(2)(B)(ii) does not deprive the Court of jurisdiction over his case because the decision of when to adjudicate an I-485 application is not a matter of "pure discretion." (Pl. Opp. at 7, citing Spencer Enterprises, 345 F.3d at 690). Plaintiff would have this Court adopt the position of the Ninth Circuit that a decision must be "entirely discretionary" and "entirely lacking in statutory guidelines" before 8 U.S.C. § 1252(a)(2)(B)(ii) may deprive a court of jurisdiction. Spencer Enterprises, 345 F.3d at 690. This standard is inconsistent with the plain language of § 1252(a)(2)(B)(ii) and has not been embraced by other courts. Even if the Court adopted it, however, § 1252(a)(2)(B)(ii) would still deprive the Court of jurisdiction over this case.

In Spencer Enterprises, the Ninth Circuit considered whether it had jurisdiction to review the denial of a visa application under 8 U.S.C. § 1153(b)(5)—a provision that differs significantly from 8 U.S.C. § 1255(a). Unlike § 1255(a), § 1153(b)(5) mandates that "[v]isas *shall* be made available" as long as certain clearly specified eligibility criteria are met. Spencer Enterprises, 345 F.3d at 691 (emphasis added). In light of this mandatory language and the existence of objective criteria against which to measure visa eligibility, both the plaintiff *and the Department of Justice* agreed that 8 U.S.C. § 1252(a)(2)(B)(ii) did not deprive the Court of jurisdiction. See id. at 689. The Court agreed and went on to broadly pronounce that discretionary acts over which the courts lack jurisdiction under § 1252(a)(2)(B)(ii) are matters of

---

[6] Spencer Enterprises, Inc. v. United States, 345 F.3d 683 (9th Cir. 2003), is a Ninth Circuit case, not a Second Circuit case. This correction to Plaintiff's Opposition is important because the Ninth Circuit appears to stand alone in its interpretation of § 1252(a)(2)(B)(ii), and at least one Second Circuit judge has expressly condemned it. See Zhang v. Gonzales, 457 F.3d 172, 179 n.4 (2d Cir. 2006) (Cabranes, J. concurring).

"pure discretion, rather than discretion guided by legal standards." Id. at 690.[7]

Plaintiff admits that the ultimate decision of whether to grant or deny adjustment of status under 8 U.S.C. § 1255(a) is discretionary, and is not subject to judicial review absent constitutional infirmity. (Pl. Opp. at 2). He contends, however, that the process of adjudicating an adjustment of status application is guided by legal standards, and thus, is not a matter of "pure discretion" over which the courts lack jurisdiction under § 1252(a)(2)(B)(ii). (Pl. Opp. at 7-8).

Even if the Court were to follow the Ninth Circuit's "pure discretion" standard, no legal standards exist to constrain agency discretion over when to adjudicate an I-485 application. Plaintiff argues that the process of adjudicating an adjustment application is not "entirely discretionary" because 8 U.S.C. § 1255(a) provides that an alien's status may be adjusted "under such regulations as [the Attorney General] may prescribe . . . if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the application." 8 U.S.C. § 1255(a). Such broad conditions differ markedly from the mandatory language and specific eligibility criteria of 8 U.S.C. § 1153(b), which led the Ninth Circuit to conclude that visa issuance was not "entirely discretionary." Spencer Enterprises, 345 F.3d at 691. Moreover, nothing in § 1255(a)—or even in the regulations that the Attorney General "may prescribe," id.[8]—provides guidelines for *how* or *when* USCIS must determine

---

[7] Plaintiff points out in a footnote that in Spencer Enterprises, 345 F.3d at 690, the Ninth Circuit noted that the heading of § 1252(a)(2)(B) is "Denials of discretionary relief." (Pl. Opp. at 7 n.2). It is well-established that "[t]he heading of a section cannot limit the plain meaning of the text." Brotherhood of Railroad Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29 (1947). The broad language of subsection (ii) is not limited to denials of discretionary relief.

[8] Spencer Enterprises teaches that in determining whether a matter is one of "pure discretion," it is inappropriate to look to agency regulations. See 345 F.3d at 691 ("Under § 1252(a)(2)(B)(ii), such standards must be found in the statutes; if the statute specifies that the

12

whether an alien is eligible for permanent residence status. <u>Cf.</u> 8 U.S.C. § 1447(b) (specifying

that USCIS has 120 days to adjudicate naturalization applications after examination). Rather,

that decision remains "wholly discretionary," and subject to public safety and national security

considerations that take variable amounts of time to resolve. <u>Zheng</u>, 166 F. Supp. at 880.

      In any event, there are good reasons for this Court simply to reject the Ninth Circuit's

restrictive approach. Judge Beezer issued a strong dissent in <u>Spencer Enterprises</u>, pointing out

that the majority's holding "essentially added another word into § 1252(a)(2)(B)(ii): 'no court

shall have jurisdiction to review . . . any other decision or action of the Attorney General the

authority for which is specified under this subchapter to be ENTIRELY in the discretion of the

Attorney General." <u>Spencer Enterprises</u>, 345 F.3d at 695 (Beezer, J. dissenting) (capital letters

original); <u>see also Zhang v. Gonzales</u>, 457 F.3d 172, 179 n.4 (2d Cir. 2006) (Cabranes, J.

concurring) ("[E]ven on its own terms, [the Ninth Circuit's] interpretation of § 1252(a)(2)(B)(ii)

is inconsistent with the plain meaning of the statute, which explicitly refers to decisions that rest

'*in the discretion* of the Attorney General,' 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added), not to

decisions that rest 'entirely,' 'truly,' or 'purely' in the discretion of the Attorney General."). In

addition to noting the lack of textual justification for the majority's view, the dissent further

observed that the Ninth Circuit's rule conflicts with the opinions of two other circuits, <u>CDI Info.</u>

<u>Servs., Inc. v. Reno</u>, 278 F.3d 616, 620 (6th Cir. 2002), and <u>Van Dinh v. Reno</u>, 197 F.3d 427, 435

n. 5 (10th Cir. 1999). <u>See also Oropeza-Wong v. Gonzales</u>, 406 F.3d 1135, 1142 (9th Cir. 2005)

(acknowledging that the Third and Fifth Circuits have also reached a different result than the

Ninth Circuit). These other courts' views are equally persuasive authority to this Court. Finally,

---

decision is wholly discretionary, regulations or agency practice will not make the decision
reviewable.").

Judge Beezer observed, the Spencer Enterprises approach fails to "give due deference to the Executive Branch in the immigration context." 345 F.3d at 694, 700.

In sum, while this Court should reject the Ninth Circuit's unfounded requirement that a decision be "entirely discretionary," even if it adopted this approach, the decision of when to adjudicate an adjustment of status application under 8 U.S.C. § 1255(a) is an entirely discretionary decision that the Court lacks jurisdiction to review.  Accordingly, Plaintiff's claims should be dismissed in their entirety.  To the extent the Court agrees that it lacks jurisdiction under § 1252(a)(2)(B)(ii), it need not consider the remaining arguments.

### III.     The Court Lacks Jurisdiction Under the Mandamus Statute, 28 U.S.C. § 1361, to Compel Immediate Adjudication of Plaintiff's Application.

As explained in Defendant's opening memorandum, Plaintiff cannot establish that the Court has jurisdiction to issue a writ of mandamus under 28 U.S.C. § 1361 because he has no clear right to have his I-485 application "immediately" adjudicated (Verified Complaint for Mandamus and Declaratory Judgment, p. 9), and USCIS has no clear, ministerial duty to rule on his application within any set time frame.  (Def. Mem. at 9-11).  Indeed, Plaintiff's Opposition fails to identify any statute or regulation that mandates adjudication of I-485 applications within a particular time frame.  Plaintiff suggests that there is a ministerial, non-discretionary duty to adjudicate I-485 applications "in a timely manner," and not in an "unreasonable" amount of time, but neither the statute nor the regulations he cites impose such an obligation.[9]  (Pl. Opp. at 11,

---

[9] To the extent such an obligation arises under the APA, 5 U.S.C. § 555(b), jurisdiction would arise under 28 U.S.C. § 1331, not 28 U.S.C. § 1361.  See Califano v. Sanders, 430 U.S. 99, 107 (1977).  As explained *infra* Part IV, however, judicial review is also precluded under the APA because Plaintiff seeks review of agency action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).

citing 8 U.S.C. § 1103; 8 C.F.R. §§ 1245.2(a)(5)(i), 1245.6).[10]

In contrast with the numerous cases holding that district courts lack mandamus jurisdiction under these circumstances, (see Def. Mem. at 10, listing cases), Plaintiff has not identified a single case supporting his claim for mandamus relief under § 1361.  Instead, he attempts to distinguish two of the cases cited by Defendant on factual grounds related to the length of the delay experienced by the aliens.  Such grounds are irrelevant to whether the Court can exercise mandamus jurisdiction under 28 U.S.C. § 1361.

In both Saleh v. Ridge, 367 F. Supp. 2d 508 (S.D.N.Y. 2005), and Zheng, the reasonableness of the delay was relevant not to the courts' mandamus analysis, but only to their analysis of the *merits* of plaintiffs' *APA* claims.[11]  See Saleh, 367 F. Supp. 2d at 513 (S.D.N.Y.

---

[10] 8 U.S.C. § 1103 merely provides, in relevant part, that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a). 8 C.F.R. § 245.6 provides that "[e]ach applicant for adjustment of status under this part shall be interviewed by an immigration officer," unless such an interview is deemed to be unnecessary.  8 C.F.R. § 245.2(a)(5)(i) states that "the applicant shall be notified of the decision of the Director, and, if the application is denied, the reasons for the denial."  These provisions say nothing about the timeliness of adjudication.

[11] In view of the presence of a threshold jurisdictional issue, Defendant has not argued at the motion to dismiss stage that the Agency's actions were reasonable under the APA.  Plaintiff has nevertheless argued that the Agency's failure to adjudicate his application is "unreasonable," (Pl. Opp. at 17), because he believes that he has "survived the scrutiny of 'more than twenty federal law enforcement and intelligence agencies, but he has nonetheless failed to pass muster in the eyes of CIS" (id. at 19).  As explained above, see supra Part I, the Reader Declaration demonstrates that Plaintiff has not, in fact, "survived the scrutiny" of all of these agencies.  Rather, "[f]ollowing these checks, there are issues requiring further inquiry by USCIS to determine [his] eligibility for lawful permanent residence status."  DEX 1, ¶ 11.  As Plaintiff has raised the issue in his brief, it must be noted that resolving these issues is not only reasonable, but also expected by the INA and the regulations previously cited.  In addition to the need to perform and resolve such checks, "the volume of applications for adjustments in the system" contributes to the length of time required for adjudication.  Saleh, 367 F. Supp. 2d at 513; see USCIS, "Applications for Immigration Benefits," http://uscis.gov/graphics/shared/aboutus/msrmar06/BENEFITS.HTM (last visited Apr. 17, 2006) (noting that 813,270 I-485 applications were pending at the end of January 2006).

2005) (considering length of delay in connection with the defendant's motion for summary

judgment as to the plaintiff's APA claim); Zheng, 166 F. Supp. at 880 (explaining that even if

judicial review could be had under the APA, the plaintiff's APA claim would fail on the merits).

Indeed, the length of delay played no role in the courts' purely *legal* conclusion that mandamus

relief was inappropriate.  See Saleh, 367 F. Supp. 2d at 511 ("Adjustment of immigration status,

however, is a discretionary act, and therefore, '[i]n keeping with the plain language of [8 U.S.C.

§ 1255(a)], courts have consistently found mandamus inappropriate in actions based on the

government's failure to adjust an applicant's status.") (brackets original); Zheng, 166 F. Supp.

2d at 880 ("The INS's duty to schedule interviews regarding adjustment applications is part of

the adjustment process, which is wholly discretionary. Matters within the INS's discretion are not

reviewable under the mandamus statute.  Thus, courts in this district have repeatedly held that

mandamus relief is unavailable for delays in the adjustment process.") (internal citations

omitted).

    Here, too, the amount of time USCIS has taken to adjudicate Plaintiff's application is

irrelevant to the legal question of whether Plaintiff has a clear right to immediate adjudication

and whether a Defendant has a "clear, non-discretionary duty" under § 1361.  See Heckler v.

Ringer, 466 U.S. 602, 616-17 (1984).   In the end, Plaintiff simply cannot demonstrate what is

required for this Court to grant the "extraordinary" writ of mandamus: a clear, non-discretionary

duty to adjudicate an adjustment of status application within a particular time frame.  Allied

Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980).

**IV.    The APA Precludes Judicial Review Because the Agency Action at Issue is
         Committed to Agency Discretion.**

    As explained in Defendant's opening memorandum, 5 U.S.C. § 701(a)(2) precludes this

Court from reviewing the Agency's actions under the APA because the decision of when to

adjudicate an adjustment of status application lies within the discretion of the Attorney General. (Def. Mem. at 11-14). In response, Plaintiff asserts that there is a distinction between the APA's requirement of timely adjudication of discretionary decisions and the non-reviewability of "agency action [that] is committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). (Pl. Opp. at 15). Plaintiff also presents a case, Kim v. Ashcroft, 340 F. Supp. 2d 384 (S.D.N.Y. 2004), in which the district court found that APA review was appropriate.[12]

Plaintiff's attempt to distinguish between the APA's timeliness requirement and the non-reviewability of "agency action [that] is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), overlooks that the two concepts come together through the APA's definition of "agency action." Section 551(13) defines "agency action" to include a "failure to act." 5 U.S.C. § 551(13). The "agency action" Plaintiff is challenging through this lawsuit is USCIS's failure thus far to grant or deny his I-485 application. For the reasons explained above, however, see supra Part II.A, the Attorney General's discretion to grant or deny adjustment of status under 8 U.S.C. § 1255(a) necessarily encompasses discretion to decide when it is appropriate to do so. It is clear that such action is committed to agency discretion under § 701(a)(2) because there are no statutes or regulations that guide when an application should be adjudicated. Consequently, "the court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985). Several courts have found that APA

---

[12] Most of the other cases cited by Plaintiff do not address whether judicial review under the APA is permissible. Neither Iddir v. INS, 301 F.3d 492 (7th Cir. 2002) nor Patel v. Reno, 134 F.3d 929, 933 (9th Cir. 1997), involved APA claims at all. Moreover, both Nadler v. INS, 737 F. Supp. 658 (D.D.C. 1989), and Jefrey v. INS, 710 F. Supp. 486 (S.D.N.Y. 1989), dealt exclusively with whether fees under the Equal Access to Justice Act (EAJA) were appropriate where the INS had asserted that the delay in adjudication was reasonable. The latter cases did not address the threshold question of whether the APA precluded judicial review, and it is unclear whether that argument was even presented to those courts.

review is unavailable under such circumstances. See Zheng, 166 F. Supp. 2d at 878-89; Karan v. McElroy, No. 02 Civ. 6678(JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Rahman v. McElroy, 884 F. Supp. 782, 787-88 (S.D.N.Y. 1995).

The reasoning of Kim v. Ashcroft, 340 F. Supp. 2d 384 (S.D.N.Y. 2004), does not compel a different conclusion. There, the district court rejected the Government's argument that 5 U.S.C. § 701(a)(2) precluded review because, the court reasoned, "*whether* to adjudicate an adjustment application is not discretionary, but governed by section 6 of the APA." Id. at 389 (emphasis altered). As the Reader Declaration demonstrates, however, the proper question in this case is not *whether* USCIS ever intends to adjudicate Plaintiff's adjustment of status application, but rather *when* it will do so.

There is no evidence that the Agency has ceased considering Plaintiff's application. To the contrary, the Reader Declaration demonstrates that "USCIS is continuing to review information and to evaluate the eligibility of the applicant for lawful permanent residence status." DEX 1, ¶ 11. When the focus is properly oriented toward *when* the agency will adjudicate Plaintiff's application, as opposed to *whether* it will ever do so, it is clear that the relevant decision is committed to agency discretion and that judicial review under the APA is precluded by § 701(a)(2).

## CONCLUSION

For the foregoing reasons, and those set forth in Defendant's opening memorandum, the Court should find that 8 U.S.C. § 1252(a)(2)(B)(ii) divests the Court of jurisdiction over this case and that dismissal under Rule 12(b)(1) is appropriate. In the alternative, the Court should grant Defendant's Motion to Dismiss pursuant to Rules 12(b)(1) and/or 12(b)(6) on the grounds that mandamus jurisdiction does not lie, and review under the APA is precluded.

Respectfully submitted,

CHUCK ROSENBERG
United States Attorney

By:    _____
Lauren A. Wetzler
Assistant United States Attorney

2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3752
Fax: (703) 299-3983

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of December, 2006, a true and correct copy of the

foregoing was served upon Plaintiff by first-class mail at the following address:

> Andres Benach, Esq.
> Thomas Ragland
> MAGGIO & KATTAR, P.C.
> 11 Dupont Circle NW
> Suite 775
> Washington, DC 20036

Lauren A. Wetzler
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKRAM SAFADI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No: 1:07cv01817 |
| | ) |
| PAUL NOVAK, DIRECTOR | ) |
| VERMONT SERVICE CENTER, | ) |
| U.S. CITIZENSHIP AND | ) |
| IMMIGRATION SERVICES; | ) |
| | ) |
| EMILIO T. GONZALEZ, | ) |
| DIRECTOR U.S. CITIZENSHIP AND | ) |
| IMMIGRATION SERVICES; | ) |
| | ) |
| MICHAEL CHERTOFF, | ) |
| SECRETARY U.S. DEPARTMENT OF | ) |
| HOMELAND SECURITY; | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF KEITH CANNEY

I, Keith Canney, hereby declare:

I am the Functional Manager for the Vermont Service Center, United States Citizenship and Immigration Services (USCIS) in the Department of Homeland Security.

1)      I have been employed by the Immigration and Naturalization Service or its successor agency, USCIS, since 1992.

(2)      In this capacity, and based upon reasonable inquiry and my knowledge of the case of Akram Safadi, including but not limited to the applicant's administrative file (A96 287 866), I state the following:

(3)      On January 9, 2008, I executed a declaration in support of the Government's Motion to Dismiss the instant matter. All of the information in that declaration is true and correct.

(4)    It is similarly true that USCIS misplaced petitioner International Community Marketing's immigrant petition for alien worker, Form I-140, filed on behalf of applicant. USCIS was able to reconstruct that filing with the assistance of plaintiff's counsel, Andres Benach, who provided copies of all previously filed documentation relating to the petition.

(5)    On December 7, 2007, USCIS issued a Notice of Action, Form I-797, requesting additional information related to petitioner International Community Marketing's immigrant visa petition for alien worker, Form I-140.

(6)    Petitioner responded to the Notice of Action on January 18, 2008 and on January 23, 2008. USCIS is reviewing that information in the ongoing adjudication of petitioner's I-140.

(7)    As indicated in my declaration dated January 9, 2008, the results of FBI name checks, FBI fingerprint checks, and IBIS checks regarding applicant's eligibility for lawful permanent resident status have produced issues that require further vetting by USCIS.

(8)    The circumstances relating to the adjudication of petitioner International Community Marketing's immigrant visa petition for alien worker, Form I-140, do not change the fact that there are security issues relating to applicant's eligibility for a green card that USCIS continues to assess.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on the /9th of February, 2008.

Keith Canney
Functional Manager for the
Vermont Service Center
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

AKRAM SAFADI                                    )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )          Civil Action No: 1:06cv1055
                                                )
PHYLLIS A. HOWARD,                              )
WASHINGTON DISTRICT                             )
DIRECTOR OF UNITED STATES                       )
CITIZENSHIP AND IMMIGRATION                     )
SERVICES,                                       )
                                                )
            Defendant.                          )


## DECLARATION OF TODD W. READER

I, Todd W. Reader, hereby declare:

      I am the Acting Service Center Director for the Vermont Service Center, United
States Citizenship and Immigration Services (USCIS) in the Department of Homeland
Security.

      1)    I have been employed by USCIS or its successor agency, the Immigration
and Naturalization Service, since June 1982.

      (2)    In this capacity, and based upon reasonable inquiry and my knowledge of
the case of Akram Safadi, including but not limited to the applicant's administrative file
(A96 287 866), I state the following:

      (3)    When a lawful permanent resident alien applies for adjustment of status,
USCIS conducts several forms of security and background checks to ensure that the alien
is eligible for the benefit and that he or she is not a risk to national security or public
safety. In addition to record checks against DHS's own immigration systems, these
background checks currently include (a) a Federal Bureau of Investigation (FBI)
fingerprint check for relevant criminal history records on the alien (e.g., arrests and
convictions); (b) a check against the DHS-managed Interagency Border Inspection

System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity. No immigration benefit (e.g., adjustment of status, naturalization/U.S. citizenship) is granted unless and until all the above-required background checks have been completed and resolved.

(4)　　These law enforcement checks have revealed significant derogatory information on alien applicants for immigration benefits, including applicants seeking adjustment of status, which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the application. In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check alone.

(5)　　If a background or security check reveals verified derogatory information on the alien (i.e., a positive result), the USCIS works with other divisions of DHS and other law enforcement and intelligence agencies, as necessary, to obtain all available information concerning the derogatory record. Depending on the information, DHS/ICE may place the alien in immigration proceedings to remove him or her from the United States.

(6)　　Although the alien's file may show that an FBI fingerprint check was performed, the fingerprint checks frequently do not reveal the types of derogatory information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or an FBI name check of investigation databases.

(7)　　It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States lawful permanent resident status without ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien. With lawful permanent resident status, a person

who is a risk to the public or the nation's security could obtain work in sensitive industries and travel on transportation carriers more easily.

(8)    FBI name checks were initiated on the applicant on or around December 3, 2002. On or around August 6, 2003, USCIS received the name check response from the FBI.

(9)    FBI fingerprint checks of the applicant were initiated on or around February 12, 2003 and August 31, 2004. USCIS received the results of the fingerprint checks from the FBI on or around February 12, 2003 and August 31, 2004, respectively.

(10)    IBIS checks were initiated on the applicant and responses received on or around June 2006 and September 2006.

(11)    Following these security checks, there are issues requiring further inquiry by USCIS to determine the applicant's eligibility for lawful permanent residence status. USCIS is continuing to review information and to evaluate the eligibility of the applicant for lawful permanent residence status.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _16_ of November, 2006.

Todd W. Reader
Acting Service Center Director for the
Vermont Service Center
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security